# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00008-CV

**Jon C. Baker, Appellant**

**v.**

**Amanda D. Baker, Appellee**

---

### FROM THE 261ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-13-001369, THE HONORABLE TIM SULAK, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Jon C. Baker (Father) appeals from the trial court's final order in a suit to modify the parent-child relationship. In six issues, he complains about the trial court's rulings concerning his children's extracurricular and extended summer activities, their tutoring, his communications with his children and others regarding their activities, his obligations to pay additional expenses and child support arrearage, and the provision deeming the children's therapists confidential. For the following reasons, we affirm the trial court's final order.

### BACKGROUND

Father and Amanda D. Baker (Mother) divorced in November 2013. Among the terms of their agreed final decree of divorce, they were appointed joint managing conservators of their two children, who were 6 and 2 in 2013, with a modified standard possession order; Mother was appointed the managing conservator with the exclusive right to designate the children's

primary residence; Father was obligated to pay monthly child support of $850 with a stair-step down provision; and when they agreed to enroll their children in an extracurricular activity, the parents were each obligated to pay 50% of the costs associated with that activity.

In 2018, Mother filed a petition to modify the agreed final decree of divorce, and Father filed a counterpetition. They both sought modifications concerning possession and access to the children, expenses, child support, and decision-making authority. Among his requested relief, Father sought to have the decree modified to appoint him as the joint managing conservator with the right to designate the children's primary residence, to have him receive child support, and to order Mother to schedule extracurricular activities for the children only during her periods of possession. Mother's requested relief included modification of the monthly child support, her appointment as the "tie-breaker" after consulting with Father over certain decisions, and the continuation of their older child's extracurricular activities of cheer and tumbling at Cheer Athletics (CA) and their younger child's tutoring and extracurricular activity of playing soccer at Lonestar Soccer Club (Lonestar). Father agreed with their younger child continuing with soccer but not with their older child continuing with cheer and tumbling at CA. Mother also sought to obtain therapy for their children because she had been unable to obtain Father's consent, and their older child was depressed and threatening self-harm.

Prior to trial, the trial court signed multiple temporary orders. In December 2018, the trial court signed agreed temporary orders appointing a guardian ad litem for the children, *see* Tex. Fam. Code § 107.002 (listing powers and duties of court-appointed guardian ad litem for child), and authorizing Mother to select a mental health treatment provider for the children. In November 2019, the trial court signed temporary orders authorizing the guardian ad litem to select a new therapist for the children and ordered that the new therapist was "deemed

2

'confidential'" and generally not subject to subpoena or deposition or required to reveal the content of therapy. The Court also ordered that upon the older child's election, she could continue with tumbling, cheer, and related activities at CA; that the younger child could continue with soccer at Lonestar; that Mother was the primary contact at Lonestar and CA and responsible for all costs associated with those activities; and that Father was prohibited from attending activities at CA or communicating with either child regarding those activities other than to direct the child to her therapist or the guardian. The court also enjoined the parties from discussing this case with the children. And in March 2020, the trial court signed temporary orders that found that Father had violated the court's order not to discuss the case with the children.

The final trial occurred June 29 and 30, and July 1, 2020, when the children were 13 and 9. Witnesses included the parents, the children's therapist from November 2018 to May 2019, an optometrist who testified about the younger child's vision therapy, the mother of a child who was on the older child's cheer team, the owner of CA, the owner of another cheer facility where the older child had competed for a short time, the children's paternal grandmother,[1] and the children's guardian ad litem. The trial judge also privately conferred with the older child. *See id.* §§ 153.009 (addressing when trial court in bench trial must interview child twelve years of age or older in chambers to determine child's wishes), 156.101 (explaining when trial court may modify order establishing conservatorship or possession and access based on child's expressed preference to court in chambers). The evidence showed that during the pendency of the case, the parents continued to disagree regarding their children, that the children at times were placed in the middle of their parents' disputes, and that statements that the older

---

[1] The grandmother was the mother-in-law of Father, who had remarried.

3

child made about what she wanted and what was happening at her parents' respective homes were inconsistent or not true.[2]

The guardian ad litem testified about her recommendations based on the children's best interest, and her detailed final report to the court was admitted as an exhibit. She recommended that the parents continue as joint managing conservators with Mother having the exclusive right to designate the primary residence of the children and to receive child support and, after "meaningful consultation" with Father, the right to make decisions concerning the children, including decisions related to education, therapy, and extracurricular activities. The guardian ad litem identified concerns about Father and portions of his testimony that she testified were not true.[3] Based on her concerns, she recommended that Father set up family therapy with his children and provided the name of a therapist. Consistent with the guardian ad litem's recommendation, evidence showed that Father on multiple occasions had improperly communicated with the children and their extracurricular organizations, placing the children in the middle of the parents' disputes.

After taking the matter under advisement, the trial court advised the parents by letter of its decisions to continue the parents as joint managing conservators with Mother having

---

[2] The evidence showed that Mother placed a recording device in the older child's bedroom for approximately four months. Mother testified that she did so because they "had gotten to a place where the lies and the statements that were being made were just completely out of control" and that her older child needed to have "some sort of accountability for these things that she was saying." For example, during the pendency of the case, the older child reported to Father that Mother's boyfriend had assaulted her, resulting in a Child Protective Services investigation, but the evidence showed that the older child provided a different version of what happened to CPS and that CPS ultimately ruled out the allegation. Shortly after the CPS investigation, Mother discontinued her relationship with her boyfriend.

[3] For example, the guardian ad litem denied Father's testimony that she was "in cahoots" with him about the children's initial therapist, that she had asked the children to record Father, and that the guardian ad litem's physical and mental health was in question.

the exclusive right to designate the children's primary residence and Father having expanded standard possession; to require Father to pay Mother child support of $2,340 per month, retroactive to August 1, 2018; and to appoint Mother to be the decision maker, "after meaningful consultation" with Father, regarding the children's education, invasive medical treatment, and psychological and psychiatric treatment.

The parents thereafter corresponded with the trial court and each other and exchanged proposed orders and revisions to the proposed orders until the trial court signed the final order in October 2020. The final order follows the outline of the trial court's letter ruling to the parents but also provides injunctive relief and specific provisions about the children's extracurricular activities and other areas of dispute. Relevant to this appeal, the final order provides that Mother has the exclusive right to select, register, and enroll the children in extracurricular and extended summer activities, including Lonestar and CA, without regard to the parents' periods of possession; that she was responsible for the costs and would be the primary contact for those activities; and that Father is prohibited from communicating with either child or the organization about extracurricular activities without Mother's agreement or "as directed" by a family or the child's therapist. The court also ordered that Mother has the exclusive right to enroll the children in tutoring without regard to the parents' periods of possession, that Father will not unreasonably withhold his consent, and that the parents will each pay 50% of the tutoring costs. The court further required the parents generally to transport the children to their activities and tutoring during their respective periods of possession.

The trial court also appointed Mother as the decision maker, after meaningful consultation with Father, regarding the children's mental health and psychiatric and psychological treatment and provided that a therapist selected by Mother would be "deemed

5

'confidential'" such that the therapist is not subject to subpoena or required to testify or reveal the content of therapy sessions with the children "except as determined by the therapist or as otherwise ordered by the Court." The court further ordered the parents to continue to communicate through the platform "Our Family Wizard" and Father to pay child support, enjoined the parents from interfering with the children's therapy or extracurricular activities or discussing the case with the children, and awarded Mother judgments for retroactive child support in the amount of $32,780 and for attorney's fees, expenses, and costs in the amount of $24,700. The judgments were payable no later than October 31, 2021. The trial court also signed an income withholding order directed to Father's employer for payment of the court-ordered monthly and retroactive child support and findings of fact and conclusions of law. This appeal followed.

## ANALYSIS

On appeal, Father contends that his appeal is based on the trial court's "additional clarifications and injunctions and how they morphed into what became the final orders in this case."[4] Specifically, his six issues challenge provisions in the final order that address the children's extracurricular and extended summer activities, tutoring, Father's communications

---

[4] Father complains about factual allegations in the parents' correspondence with the trial court after the trial court's letter ruling, contending that the factual allegations were not in evidence or occurred after the trial and that if the trial court's final order would have followed its letter ruling, "no appeal would have followed." We limit out review to the evidence admitted during trial. *See Barnard v. Barnard*, 133 S.W.3d 782, 789 (Tex. App.—Fort Worth 2004, pet. denied) ("A trial judge is presumed to consider only testimony and exhibits properly in evidence."); *see also B.L.M. v. J.H.M.*, No. 03-14-00050-CV, 2014 Tex. App. LEXIS 7707, *39–40 (Tex. App.—Austin July 17, 2014, pet. denied) (mem. op.) (explaining that "we are limited to considering the material that was before the trial court at the time that it ruled . . . [and] documents not admitted into evidence are not considered by an appellate court" (quoting *Barnard*, 133 S.W.3d at 789 (citations omitted)).

6

with his children and their extracurricular organizations, the confidentiality of the children's therapist, and child support arrearages.

**Standard of Review**

We review the trial court's modification order under an abuse of discretion standard. *In re J.R.D.*, 169 S.W.3d 740, 742–43 (Tex. App.—Austin 2005, pet. denied). "A trial court's order modifying a joint managing conservatorship will not be disturbed on appeal unless the complaining party can show a clear abuse of discretion." *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). When reviewing the trial court's modifications, we consider (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of its discretion based on the evidence before it. *See Iliff v. Iliff*, 339 S.W.3d 126, 134 (Tex. App.—Austin 2009) *aff'd*, 339 S.W.3d 74 (Tex. 2011); *see Zeifman v. Michels*, 212 S.W.3d 582, 588 (Tex. App.—Austin 2006, pet. denied); *Echols*, 85 S.W.3d at 477–78.

When determining conservatorship, possession, and access to children, a trial court's primary consideration is always the children's best interest. Tex. Fam. Code § 153.002; *see Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002) ("Suits affecting the parent-child relationship are intensely fact driven, which is why courts have developed best-interest tests that consider and balance numerous factors."); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (listing non-exclusive factors for making best interest determinations). The trial court is given "wide latitude" in determining a minor child's best interest, and its judgment will be reversed only when the record as a whole shows abuse of discretion. *Gillespie*, 644 S.W.2d at 451; *see Iliff*,

7

339 S.W.3d at 133 (giving "wide latitude" to trial court's determinations on custody, control, possession, and access); *In re J.R.D.*, 169 S.W.3d at 743 (observing that "trial court is in a better position to determine what will be in the best interest of the child since it faced the parties and their witnesses, observed their demeanor, and had the opportunity to evaluate the claims made by each parent" and that "[i]ts judgment will not be disturbed on appeal unless there has been a clear abuse of discretion"). "There is no abuse of discretion if some probative and substantive evidence supports the trial court's order." *Iliff*, 339 S.W.3d at 134 (citing *Zeifman*, 212 S.W.3d at 587).

**Extracurricular and Extended Summer Activities**

In his first issue, Father argues that the trial court erred by allowing Mother "the unrestricted right to select, register, and enroll the children in any extracurricular or extended summer activity at her whim during [his] times of possession" without requiring her to confer with him and "yet obligating [him] to either comply with such selection or relinquish his right to possession, thereby depriving [him] the right to actually exercise his right to possession of the children." Father characterizes the provisions giving Mother the right to schedule activities during his periods of possession as effectively giving him less than a standard possession order and argues that under the final order, Mother has the authority to fill up his periods of possession with activities, even when he is out of town with the children visiting family or on vacation.[5]

---

[5] To the extent that Father asserts that "[t]here is not even a notice requirement" concerning the children's activities, the order expressly requires Mother to inform Father "of enrolling the child and/or the Children in an extended summer and/or extra-curricular activity," and to publish to Our Family Wizard "any and all scheduled events related to a Child and/or the Children's activities reasonably promptly following [Mother] becoming aware of same." Father and Mother are required to make "all reasonable efforts" to timely transport their children to these activities when the activities occur in their periods of possession.

For support, Father relies on the absence of findings by the trial court that he is unfit to make appropriate decisions for his children or that his time with his children should be limited or restricted, on his appointment as a managing conservator, and on his protected liberty interest as a parent in the care, custody, and control of his children. *See* Tex. Fam. Code §§ 153.252 (stating that there is rebuttable presumption that standard possession order for parent named as managing conservator is in child's best interest), .317 (outlining alternative standard possession); *Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) (discussing parents' fundamental right to make decisions concerning care, custody, and control of their children and presumption that fit parents act in their children's best interest).

The trial court's appointment of Father as a managing conservator with expanded standard possession, however, is not inconsistent with the trial court's provisions in the final order concerning the children's extracurricular and extended summer activities.[6] The Texas Family Code expressly contemplates a parenting plan that gives one parent in a joint managing conservatorship the exclusive right to make decisions concerning their children. *See* Tex. Fam. Code § 101.016 ("'Joint managing conservatorship' means the sharing of the rights and duties of a parent by two parties, ordinarily the parents, even if the exclusive right to make certain

---

[6] Among his arguments, Father argues that the trial court violated his Fourteenth Amendment right to be free from state interference "[b]y inserting itself and attempting to micro-manage the child-rearing of the children in this case." But he has not preserved this argument for our review because he did not raise it in the underlying proceeding. *See* Tex. R. App. P. 33.1(a); *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (concluding that constitutional claim was not preserved because it was not raised before trial court); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993) (same); *Wetmore v. Bresnen*, No. 03-18-00467-CV, 2019 Tex. App. LEXIS 10923, at *20 (Tex. App.—Austin Dec. 18, 2019, no pet.) (mem. op.) (same). Further to the extent Father relies on *In re C.J.C.*, 603 S.W.3d 804 (Tex. 2020), that case is factually distinguishable. That case concerned the presumption that a fit parent acts in their child's best interest in the context of a modification proceeding in which a nonparent sought conservatorship over a fit parent's objection. *Id.* at 816–20.

decisions may be awarded to one party."); *see also id.* §§ 153.071 (requiring trial court to specify rights and duties of parents that are to be exercised independently, by joint agreement, and exclusively by one parent when parents are appointed as conservators), .134(b)(2)–(4) (requiring trial court in order appointing joint managing conservators to "specify the rights and duties of each parent regarding the child's physical care, support, and education"; "include provisions to minimize disruption of the child's education, daily routine, and association with friends"; and "allocate between the parents, independently, jointly, or exclusively, all of the remaining rights and duties of a parent as provided by Chapter 151").

Although disputed, there also was evidence that allocating decision-making to Mother, including during Father's periods of possession, about the children's activities was in the children's best interest. *See Johnson v. Johnson*, No. 03-19-00196-CV, 2020 Tex. App. LEXIS 6396, at *32–33 (Tex. App.—Austin Aug. 13, 2020, no pet.) (mem. op.) (explaining that "[i]t is the fact-finder's role to resolve evidentiary conflicts and determine the weight and credibility of witnesses"); *Silverman v. Johnson*, No. 03-08-00271-CV, 2009 Tex. App. LEXIS 7176, at *31 (Tex. App.—Austin Aug. 26, 2009, no pet.) (mem. op.) (explaining that fact-finder's role "cannot be overstated" in child custody disputes, which "are intensely fact driven" (quoting *Lenz*, 79 S.W.3d at 19)).

Mother and the guardian ad litem testified about Father's disruptions to the children's routines and activities and his actions that placed the children in the middle of the parents' disputes. Mother testified that prior to 2017, the parties had not followed the periods of possession in the 2013 final decree and generally had been able to reach agreements and accommodations concerning their children's activities. After that, Mother testified that Father created "constant chaos" and "confusion" for the children by consenting to the children's

activities but then taking back his consent or not accommodating the activity, that he began tying his agreement to accommodations to Mother agreeing to modify the decree with 50/50 possession and no child support; that when she would not agree, he started interfering with activities, and the children started missing them; and that it got to the point that the children were "drug into the middle" of the parents' disputes and "distraught," and the older child was "spiraling out of control."[7] For example, the evidence showed that their older child worked hard and tried out for a "high level" team at CA with Father's consent but that after she made the team, Father then refused to agree to CA.[8] Mother also testified about Father's disruptions concerning their younger child's soccer activities and an incident involving Father and the soccer coach.

The guardian ad litem testified that she had concerns about Father's actions that disrupted the children's daily lives and routine and recommended that Mother have decision-making authority, explaining some of her reasons as follows:

> One of my concerns is that every professional that has been with the children gets some kind of letter, e-mail, voicemail or complaint from Mr. Baker. I have a voicemail with Lonestar Soccer and an e-mail. I have an e-mail with Cheer Athletics. I have—he's asked me who supervises me as guardian ad litem,

---

[7] The evidence included a short video showing the children returning to Mother's house after they stayed at Father's house overnight. The video shows a vehicle driving away with the children hurriedly walking to the front door visibly upset and crying. Mother testified that "this happened a lot." Mother also testified about the children missing specific activities and being "brought fully into the middle" of the parent's disputes. She explained that when she does not give Father "exactly what he wants, then it's going to directly impact the children, so it feels like it's putting them in the middle."

[8] The exhibits included an email in which Father advised CA in July 2018 that his older child did not have permission to participate or be on its property, and the evidence showed that the older child's "passion" was cheering, that she had reached a high skill level that CA could support, that she had friends and a "long-time" coach at CA, and that Father's refusal to allow her to participate at CA caused her "real sadness and depression" and "talking suicidal."

11

who can he go to above me, which is part of the reason why I recommend that Ms. Baker have exclusive decision-making.

She is much more flexible. She is much more willing to accommodate the girls and what they desire and want. There was a situation at the soccer thing that you heard about, with the coach. So what you didn't hear is that they moved—so that [the younger child] could continue to play, they moved [her] from one soccer team to the other; and Ms. Baker went along with that because it was about [the younger child] playing soccer and not what team she was on.

And in my experience with Ms. Baker, that's what it has been. It has been not that [the older child] be at Cheer Athletics but that [she] be at the place that she wants to be and be able to have that experience as a young girl. And she—she does really well at cheering, tumbling, whichever word you want to use. She's really good at it. She enjoys it. I would like for her to have the opportunity to continue to experience that.

The trial court also heard evidence that it was difficult to find a neutral third party willing to serve as a tiebreaker for parents who could not agree with each other, that the children's activities of cheer and soccer required consistent participation to remain in those activities, and that the activities occurred during both parents' periods of possession. By the time of trial, Father also had changed his mind about CA. He testified that he was "fine with cheer," that he had "no problem" with CA, that it seemed "like a topnotch joint, nice facility," and that he was willing to facilitate transportation and his child's participation. He also agreed with his younger child continuing with Lonestar.

Based on the evidence, the trial court within its discretion could have found that allocating decision-making authority over the children's extracurricular and extended summer activities to Mother, including during Father's periods of possession, was in the children's best interest. *See Johnson*, 2020 Tex. App. LEXIS 6396, at *33–35 (observing that there was no evidence that parent was unable to make decisions competently but considering "testimony about the parents' substantial difficulties in co-parenting, communicating with each other, and handling

appointments for the children" and trial court's finding that there was reasonable expectation that parents would be unable to reach shared decisions regarding children in future as supporting trial court's decision to appoint one parent as exclusive decision-maker). On this record, we conclude that the trial court had sufficient evidence on which to exercise its discretion and did not err in the application of its discretion when it awarded Mother decision-making authority over the children's extracurricular and extended summer activities, including during Father's periods of possession. *See Iliff*, 339 S.W.3d at 134; *Zeifman*, 212 S.W.3d at 588. We overrule Father's first issue.

**Tutoring**

Similar to his first issue concerning the children's extracurricular and extended summer activities, Father argues in his second issue that the trial court erred by allowing Mother the unrestricted right to select, register, and enroll the children in tutoring during Father's times of possession without requiring her to confer with him and obligating him to comply with such selection or relinquish his possession, thereby depriving him of his right to actual possession of the children. But unlike the provision concerning the children's activities, the trial court's tutoring provision allows Father to withhold consent during his periods of possession as long as it is reasonable to do so.[9]

---

[9] The tutoring provision provides in part:

Subject to [Mother] informing [Father] of enrolling the child and/or the Children for tutoring through Our Family Wizard, IT IS ORDERED that [Mother] shall have the exclusive right to select, register, enroll and otherwise cause a Child and/or the Children to participate in tutoring without regard to the periods of possession of either parent as otherwise set forth above for visitation. [Father] shall not unreasonably withhold his consent.

13

Evidence showed that giving Mother the right to make decisions about the children's tutoring, including during Father's periods of possession, was in the children's best interest. In addition to the evidence cited above concerning the parents' inability to agree and the difficulty of finding a neutral third party who would be willing to serve as a tiebreaker, Mother testified that a few years earlier, her younger child was placed on a "504 Plan at school"; that testing showed that "she needed the extra help specifically in math, and it kind of aligned with the vision therapy as well"; that a teacher at her younger child's school had been tutoring the child once a week for two years; and that her grades are "really good" now. Mother also testified that Father was aware of and did not oppose tutoring "[a]s long as it was scheduled on [her] time, he didn't really care, from [her] perspective" but that he had been scheduled to take the child to tutoring twice and only showed up for one of the sessions.

On this record, we conclude that the trial court did not abuse its discretion regarding the tutoring provision in the final order. *See Iliff*, 339 S.W.3d at 134; *Zeifman*, 212 S.W.3d at 588. We overrule his second issue.

**First Amendment Rights**

In his third issue, Father argues that the trial court violated his First Amendment rights by restricting his communications with his children and the extracurricular organizations regarding the children's activities. *See* U.S. Const. amend. I; Tex. Const. art. I, § 8. Father, however, has not identified in the record, and we have not found, where he made the trial court aware of this argument. Thus, he has not preserved it for our review. *See* Tex. R. App. P. 33.1(a); *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003) (holding that due process argument that appellant was raising with appellate court was not preserved below); *Dreyer v. Greene*,

14

871 S.W.2d 697, 698 (Tex. 1993) ("As a rule, a claim, including a constitutional claim, must have been asserted in the trial court in order to be raised on appeal."); *Wetmore v. Bresnen*, No. 03-18-00467-CV, 2019 Tex. App. LEXIS 10923, at *20 (Tex. App.—Austin Dec. 18, 2019, no pet.) (mem. op.) (overruling constitutional challenge to statutes because appellant did not raise challenge or obtain ruling from trial court and therefore did not preserve challenge for review). On this basis, we overrule Father's third issue.[10]

**Additional Expenses**

In his fourth issue, Father argues that the trial court erred by obligating him to pay for expenses in addition to child support obligations imposed by the court "without making any further findings regarding the proven and unmet needs of the children." Specifically, he challenges his obligation to pay 50% of the children's tutoring expenses and argues that there was no evidence offered and no allegations made that the children have any unmet needs. He relies on the trial court's finding that the appropriate amount of monthly child support obligation of $2,340 per month was in conformity with the Texas Family Guidelines and his income, *see* Tex. Fam. Code § 154.122 ("[A]n order of support conforming to the guidelines is presumed to be in the best interest of the child."), and asserts that the trial court was required to make further

---

[10] Even if he had preserved this issue for our review, we would conclude that the trial court's order does not violate his First Amendment rights. The order provides avenues for him to communicate with his children about their extracurricular activities going forward. It allows him to communicate with his children about their activities if "directed by a family therapist selected pursuant to the rights and duties above or individual therapist of a Child and/or the Children or as otherwise agreed to by and between both parents." The evidence also supported the necessity of this provision. In the guardian ad litem's final report, she recommended that Father set up family therapy with his children and provided her reasons for the recommendation and the name of a therapist, and evidence showed that Father on multiple occasions had improperly communicated with the children and their extracurricular organizations, placing the children in the middle of the parents' disputes.

findings under section 154.126 to support this additional obligation, *see id.* § 154.126 (providing guidelines for ordering additional child support "depending on the income of the parties and the proven needs of the child"). He argues that "the court added the cost of tutoring (with no limitation and no ability for [Father] to have any input) on top of [his] child support obligation."

The trial court, however, did not treat the tutoring cost as child support but as an out-of-pocket expense, and the evidence showed that the younger child needed tutoring in math. Mother testified that the younger child's cost for her tutoring in math was $40 per session, that the child goes once a week, and that the tutoring "aligned" with the vision therapy. Given that the 2013 final decree required the parties to pay 50% of agreed extracurricular and extended summer activities and the final order requires Mother to pay the full costs associated with those activities, including the significant costs associated with cheer at CA and soccer at Lonestar, we cannot conclude that the trial court abused its discretion in requiring both parties to share the expense of tutoring. We overrule Father's fourth issue.

**Confidentiality of Children's Therapist**

In his fifth issue, Father argues that the trial court erred by restricting the ability of either parent to subpoena for testimony or deposition any individual therapist for either child for any purpose. He characterizes the confidentiality provision as "overreaching" because "[t]here are already laws and regulations in place to protect this type of information from abuse by any person, including but not limited to a parent." *See* Tex. R. Evid. 509 (Physician-Patient Privilege), 510 (Mental Health Information Privilege in Civil Cases); *Abrams v. Jones*, 35 S.W.3d 620, 624–27 (Tex. 2000) (addressing when therapy records may be withheld from parent); *see also* Tex. Health & Safety Code §§ 611.004 (authorizing disclosure of confidential

information in certain specified situations), .0045 (addressing patient's right to mental health record). Father contends that the provision is "an attempt to trump those regulations, and to take away the ability of a future court to review a request for such information."

Under the trial court's order, however, the children's therapist was "deemed 'confidential'" to protect the children's privacy regarding their participation in therapy "except as determined in the discretion of the therapist or as otherwise ordered by the Court." Thus, the order expressly allows the therapist to reveal the content of therapy sessions if court ordered to do so. Further, in reaching its decision to deem the children's therapy confidential, the trial court reasonably could have considered its private conference with the older child during trial. *See* Tex. Fam. Code §§ 153.009, 156.101. The children's initial therapist also testified that it was important in a therapeutic relationship with children not to report what was happening in therapy to the parents or the children "won't trust" the therapist, and the parents agreed that the children would benefit from therapy going forward.

The trial court also reasonably could have considered the evidence that Father had acted inappropriately with the children's therapists. The initial therapist testified that the younger child stopped services after the older child reported that Father "had told them that their mom was listening outside the therapy door in the hall"[11] and that the older child had reported to the therapist statements that Father made to the child about Mother's alleged instructions to the child to lie to the therapist, causing the child to feel "confused and anxious," "upset," "in the middle" and that the child "had two panic attacks." The therapist also testified that Father told the children that he "didn't want to participate" in therapy, that "he didn't like" the therapist, and

---

[11] Both Mother and the therapist denied this accusation. The therapist testified that she told the younger child that "nobody could listen in the hallway, but then [the younger child] said, 'I'm afraid my dad is listening in the hallway and I'm not coming.'"

that he "didn't think she was a good therapist." The therapist further testified that the older child "was really scared and intimidated" with Father "in the waiting room" when she arrived for her last session. Mother testified that the relationship between the older child and the therapist was "basically sabotaged," explaining that Father "was asking what was happening in therapy and things like that, and so [the older child] didn't feel like that was a safe place at that point." Concerning the older child's new therapist, Mother testified that after the court put the temporary confidentiality order in place, it seemed like the child was "trusting the process again," and that it had "given her an outlet" but that recently Father had emailed the therapist "saying to cancel all future appointments and [the older child] didn't want to do counseling anymore." Mother testified that Father's email was not true.

Although there are laws and regulations that protect the confidentiality of mental health information, Father has not cited, and we have not found, authority that would prohibit a trial court from deeming a child's therapist confidential when evidence supported the need for such a provision. On this record, we conclude that the trial court had sufficient evidence on which to exercise its discretion and did not err in the application of its discretion when it restricted the ability of either party to subpoena for testimony or deposition any individual therapist for either child. *See Iliff*, 339 S.W.3d at 134; *Zeifman*, 212 S.W.3d at 588. We overrule Father's fifth issue.

**Judgment for Retroactive Child Support**

In his sixth issue, Father characterizes the trial court's award of a judgment for "retroactive child support" as "child support arrearages" and argues that the trial court erred by requiring repayment of this amount in violation of Texas Family Code sections 158.003 and

18

158.009, which address the withholding of income for child support. *See* Tex. Fam. Code §§ 158.003 (addressing withholding for child support arrearages in addition to current support), .009 (providing that withholding order may not exceed "50 percent of the obligor's disposable earnings").

Father's issue does not challenge the judgment's amount of $32,780 but the court-ordered payment terms obligating Father to pay $2,731.66 per month beginning on November 1, 2020, against satisfaction of the judgment. The trial court's withholding order directed Father's employer to withhold $2,340 per month for child support with a stair-step down provision plus $2,731.66 per month "for past-due child support." Father contends that section 158.003(b) required the trial court to limit the monthly amount of the withdrawal order based on paying the judgment over two years—not one year—and that the sum-total of the court-ordered withholdings was more than 60% of his disposable income and, thus, in violation of section 158.009. *See id.* §§ 158.003(b) (limiting additional amount to be withheld for child support arrearages to "amount sufficient to discharge those arrearages in not more than two years or an additional 20 percent added to the amount of the current monthly support order, whichever amount will result in the arrearages being discharged in the least amount of time"), .009. According to Father, the maximum amount that the trial court could order withdrawn to satisfy the judgment was $1,365.33 (based on payments over 24 months).

The terms of the trial court's withholding order, however, expressly state: "If you cannot withhold the full amount of support for any or all orders for this employee/obligor, withhold 50% of disposable income for all orders." *See Ayala v. Ayala*, 387 S.W.3d 721, 734 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (explaining that although court-ordered amount exceeded 50% of obligor's disposable income, trial court complied with section 158.009 because

withholding order specifically stated that maximum amount to be withheld shall not exceed 50% of obligor's disposable income). Thus, even if the total monthly amount in the withholding order exceeded 50% of Father's disposable income, the trial court's withholding order does not violate section 158.009.

Further, section 158.003, which expressly addresses withholding for child support arrearages, does not apply to the trial court's award of retroactive child support. *See In re S.M.-R.*, No. 02-15-00287-CV, 2016 Tex. App. LEXIS 12573, at *10 n.7 (Tex. App.—Fort Worth Nov. 23, 2016, no pet.) (mem. op.) (explaining that "an arrearage—unpaid support previously ordered—is distinct from retroactive child support"); *In re House*, No. 06-99-00155-CV, 2000 Tex. App. LEXIS 5970, at *6–8 (Tex. App.—Texarkana Sept. 1, 2000, no pet.) (not designated for publication) (distinguishing between child support arrearage and award of retroactive child support and explaining that award was not arrearage because obligor would only be delinquent if she did not make required payment). Among the trial court's conclusions of law, the court expressly concluded that the judgment for $32,780 was for "retroactive child support."[12] Father has not cited, and we have not found, authority that would prohibit a trial court from awarding a judgment for retroactive child support and signing a corresponding withdrawal order that requires full payment of the judgment within one year. *See* Tex. Fam. Code §§ 154.009 (authorizing trial court to order parent to pay retroactive child support), .131 (providing guidelines for awarding retroactive child support). We overrule Father's sixth issue.

---

[12] In the 2013 final decree, the monthly child support was $850. By awarding child support of $2,340, retroactive to August 1, 2018, an additional amount of $1,490 was owed for each month but not yet due.

20

**CONCLUSION**

Having overruled Father's issues, we affirm the trial court's final order in a suit to modify the parent-child relationship.

_____

Melissa Goodwin, Justice

Before Justices Goodwin, Baker, and Smith

Affirmed

Filed:   May 20, 2022